**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**TAMARA GALVAN, individually and on behalf of all others similarly situated,**

**Plaintiff,**

**v.**

**CNU OF ALABAMA, LLC, CNU OF DELAWARE, LLC, CNU OF IDAHO, LLC, CNU OF KANSAS, LLC, CNU OF LOUISIANA, LLC, CNU OF MISSISSIPPI, LLC, CNU OF MISSOURI, LLC, CNU ONLINE HOLDINGS, LLC, CNU OF SOUTH CAROLINA, LLC, CNU OF TENNESSEE, LLC, CNU OF TEXAS, LLC, CNU OF UTAH, LLC, CNU OF WISCONSIN, LLC, ENOVA INTERNATIONAL, INC., HEADWAY CAPITAL, LLC, and TENNESSEE CNU, LLC,**

**Defendants.**

**Case No.: 1:26-cv-05957**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiff Tamara Galvan ("Ms. Galvan" or "Plaintiff"), individually, and on behalf of all others similarly situated, and through her own knowledge and upon information and belief of her counsel, brings this Class Action Complaint against Defendants, CNU of Alabama, LLC, CNU of Delaware, LLC, CNU of Idaho, LLC, CNU of Kansas, LLC, CNU of Louisiana, LLC, CNU of Mississippi, LLC, CNU of Missouri, LLC, CNU Online Holdings, LLC, CNU of South Carolina, LLC, CNU of

Tennessee, LLC, CNU of Texas, LLC, CNU of Utah, LLC, CNU of Wisconsin, LLC, Enova International, Inc., Headway Capital, LLC, and Tennessee CNU, LLC.

## INTRODUCTION

1. This class action challenges predatory high interest loans designed to exploit active-duty military personnel and their families in violation of the Military Lending Act ("MLA"), 10 U.S.C. § 987, *et seq*. Congress designed the MLA to protect active-duty servicemembers of the United States Armed Forces ("covered members") and their spouses (together, "covered borrowers")[1] from predatory loans which endanger military readiness, security clearances, and servicemember retention.

2. The MLA caps interest rates charged to covered members at 36%. The loans at issue here charge interest rates between 222% and 579%. The MLA also prohibits lenders from requiring covered members to arbitrate, waive their right to a jury trial or to participate in class actions, which Defendants do here. These plain violations of the MLA render all loans to Plaintiff and the class void from inception and provide Plaintiff and the class with actual damages, punitive damages, statutory damages, litigation costs and attorney fees. 10 U.S.C. § 987 *et seq*.

3. CNU of Alabama, LLC, CNU of Delaware, LLC, CNU of Idaho, LLC, CNU of Kansas, LLC, CNU of Louisiana, LLC, CNU of Mississippi, LLC, CNU of Missouri, LLC, CNU of South Carolina, LLC, CNU of Tennessee, LLC, CNU of Texas, LLC, CNU of Utah, LLC, CNU of Wisconsin, LLC, and Tennessee CNU, LLC all do business as "CashNetUSA." The CashNetUSA brand is owned by Enova

---

[1] 32 C.F.R. 232.3(g).

International, Inc. ("Enova"), a publicly traded company, through its holding companies CNU Online Holdings, LLC ("CashNet USA Holdings") and Headway Capital, LLC ("Headway Capital"). CashNetUSA offers lending products to borrowers. It should come as no surprise based on the company names that Defendants offer lines of credit to borrowers in Alabama, Delaware, Idaho, Kansas, Louisiana, Missouri, South Carolina, Utah, Wisconsin; they offer credit availability loans to borrowers in Mississippi; they offer installment loans in Texas and Wisconsin; and they offer flex loans in Tennessee (collectively referred to as "Loans").

4. CashNet USA Holdings owns Headway Capital, LLC, CNU of Delaware, LLC, CNU of Mississippi, LLC, CNU of Missouri, LLC, CNU of South Carolina, LLC, CNU of Tennessee, LLC, CNU of Texas, LLC, and CNU of Wisconsin, LLC.

5. Headway Capital, LLC, a subsidiary of Enova, owns CNU of Alabama, LLC, CNU of Idaho, LLC, CNU of Kansas, LLC, CNU of Utah, LLC, and Tennessee CNU, LLC. And CNU of Utah, LLC owns CNU of Louisiana, LLC.

6. The MLA is relatively short and consists of only the following eight provisions: (a) Interest; (b) Annual Percentage Rate; (c) Mandatory Loan Disclosures; (d) Preemption; (e) Limitations; (f) Penalties and Remedies; (g) Servicemembers Civil Relief Act; (h) Regulations; and (i) Definitions. 10 U.S.C. § 987 (a) – (i).

7. The "interest" provision of 10 U.S.C. § 987(a) provides that a creditor who extends consumer credit to a covered member shall not require the covered member to pay interest on a loan that exceeds 36%, that violates state or federal laws, or that contains terms specifically prohibited by the MLA.

8. The "limitations" provision of 10 U.S.C. § 987(e) specifically prohibits creditors from requiring arbitration and/or requiring the waiver of legal recourse, including the right to participate in a class action and the right to jury trial. 10 U.S.C. § 987(e)(2) and (3). The limitations section also prohibits creditors from demanding unreasonable notice from the borrower as a condition for legal action (10 U.S.C. § 987(e)(4)), and from using the covered member's checking account as security for the obligation (10 U.S.C. § 987(e)(5)).

9. The mandatory loan disclosure requirement of 10 U.S.C. § 987(c) requires disclosure of certain information about interest rates exceeding 36%, and those disclosures must be made both orally and in writing and made before credit is extended. 10 U.S.C. § 987(c)(1). Because the disclosures are mandatory, any extensions of credit made without them are void as a matter of law.

10. CashNetUSA's loans violate the MLA in many ways: (1) they require Plaintiff and other covered members/class members to pay interest above 36%; (2) credit was extended without the mandatory MLA disclosures; and (3) they require mandatory arbitration, class action waivers, jury trial waivers, demand unreasonable notice before filing suit, and use the borrower's checking account as security for the loans, all in violation of 10 U.S.C. § 987(a)(3) of the MLA.

11. Plaintiff and other covered borrowers suffered a concrete injury by paying interest on loans which exceeded 36% MAPR ("Military Annual Percentage Rate") and on loans which contained the other prohibited terms listed herein.

12. The "penalties and remedies" section of the MLA makes Defendants civilly liable for the actual damages sustained by Plaintiff because of their violation of 10 U.S.C. § 987(a)(3), but not less than $500 for each violation.

13. Because the Loan documents contain terms and requirements that are specifically prohibited by the MLA, the "penalties and remedies" section of the MLA renders the loans "void from inception" as a matter of law. 10 U.S.C. § 987(f)(3). Defendants are also liable to Plaintiff and the Class for punitive damages, equitable and declaratory relief and costs of action, together with reasonable attorneys' fees, pursuant to 10 U.S.C. § 987(f)(5).

14. Plaintiff seeks justice for the thousands of covered borrowers systematically swindled and trapped by Defendants' predatory loans. This lawsuit also seeks a declaration from the court that Defendants' Loans extended to Plaintiff and the Class are void and that Defendants shall stop all ongoing collection efforts on the unlawful loans. This lawsuit also seeks to recover ill-gotten gains and obtain statutory damages for every covered borrower ensnared in this exploitative trap. What Defendants marketed as financial empowerment was in truth a calculated strategy to strip covered members and their dependents of their rights, their money, and their dignity.

## PARTIES, JURISDICTION, AND VENUE

15. This Court has subject matter jurisdiction over this matter pursuant to 10 U.S.C. § 987(f)(5)(E) and 28 U.S.C. § 1331.

16. The Court also has jurisdiction under 28 U.S.C. § 1332(d), the Class Action Fairness Act, because this is a proposed class action, on behalf of a Class of over 100 Class members, whose claims aggregate in an amount in controversy that exceeds five million dollars, and which includes members whose state citizenship is diverse from that of Defendants.

17. Enova International, Inc. ("Enova") is an active Delaware corporation with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Enova's officer and secretary is Sean Rahilly and its President/Chief Executive Officer is David Fisher. This Court possesses personal jurisdiction over Defendant, Enova International, Inc., because it deliberately and regularly conducted business, including marketing, distributing, promoting and/or extending consumer credit through its subsidiaries from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans similarly originated in Chicago, Illinois. Enova is subject to general jurisdiction, has lent to residents of Illinois and other states from its headquarters in Chicago, Illinois, and profited handsomely from its business in Illinois relevant to this Complaint.

18. CNU Online Holdings, LLC ("CashNet USA Holdings"), is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. CashNet USA Holdings secretary is Sean Rahilly. CashNet USA Holdings is a manager or has the authority of a manager for the following entities: CNU of Alabama, LLC, CNU of Delaware, LLC, CNU of Kansas, LLC, CNU of Mississippi, LLC, CNU of Missouri, LLC, CNU of South

Carolina, LLC, CNU of Tennessee, LLC, CNU of Texas, LLC, and CNU of Wisconsin, LLC. This Court possesses personal jurisdiction over CashNet USA Holdings because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit through its subsidiaries from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans similarly originated in Chicago, Illinois. CashNet USA Holdings is subject to general jurisdiction and has profited handsomely from its business in Illinois relevant to this Complaint.

19. Headway Capital, LLC ("Headway Capital"), is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Headway Capital's secretary is Sean Rahilly. Headway Capital is a manager or has the authority of a manager for the following entities: CNU of Idaho, LLC, Tennessee CNU, LLC, and CNU of Utah, LLC. This Court possesses personal jurisdiction over Headway Capital because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit through its subsidiaries from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans similarly originated in Chicago, Illinois. Headway Capital is subject to general jurisdiction and profited handsomely from its business in Illinois relevant to this Complaint.

20. CNU of Alabama, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600,

Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Alabama, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit through its subsidiaries from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Alabama, LLC, similarly originated in Chicago, Illinois. CNU of Alabama, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

21. CNU of Delaware, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Delaware, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Delaware, LLC, similarly originated in Chicago, Illinois. CNU of Delaware, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

22. CNU of Idaho, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Idaho, LLC because it deliberately and regularly conducted business,

including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Idaho, LLC, similarly originated in Chicago, Illinois. CNU of Idaho, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

23. CNU of Kansas, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Kansas, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Kansas, LLC, similarly originated in Chicago, Illinois. CNU of Kansas, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

24. CNU of Louisiana, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Louisiana, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Louisiana, LLC, similarly originated in Chicago, Illinois. CNU of Louisiana, LLC is

subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

25. CNU of Mississippi, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Mississippi, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Mississippi, LLC, similarly originated in Chicago, Illinois. CNU of Louisiana, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

26. CNU of Missouri, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Missouri, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Missouri, LLC, similarly originated in Chicago, Illinois. CNU of Missouri, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

27. CNU of South Carolina, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of South Carolina, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of South Carolina, LLC, similarly originated in Chicago, Illinois. CNU of South Carolina, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

28. CNU of Tennessee, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Tennessee, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Tennessee, LLC, similarly originated in Chicago, Illinois. CNU of Tennessee, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

29. CNU of Texas, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago

Illinois. Its secretary is Sean Rahilly. A document filed with the Illinois Secretary of State lists the Chief Analytics Officer and the Chief Financial Officer from Enova as managers or members having the authority of a manager over CNU of Texas, LLC. This Court possesses personal jurisdiction over CNU of Texas, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Texas, LLC, similarly originated in Chicago, Illinois. CNU of Texas, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

30. CNU of Utah, LLC is an active Delaware LLC with its principal place of business and headquarters located at 4700 Daybreak Pkwy, Ste 200, South Jordan, UT 84009. Its secretary is Sean Rahilly. Headway Capital owns CNU of Utah, LLC, and CNU of Utah, LLC owns CNU of Louisiana, LLC. Both Headway Capital and CNU of Louisiana, LLC are headquartered at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. This Court possesses personal jurisdiction over CNU of Utah, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from the Chicago headquarters of its parent and subsidiary. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Utah, LLC, similarly originated in Chicago, Illinois. CNU of Utah, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

31. CNU of Wisconsin, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. Its secretary is Sean Rahilly. This Court possesses personal jurisdiction over CNU of Wisconsin, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving CNU of Wisconsin, LLC, similarly originated in Chicago, Illinois. CNU of Wisconsin, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

32. Tennessee CNU, LLC is an active Delaware LLC with its principal place of business and headquarters located at 175 W. Jackson Blvd., Suite 600, Chicago Illinois. This Court possesses personal jurisdiction over Tennessee CNU, LLC because it deliberately and regularly conducted business, including marketing, distributing, promoting, and/or extending consumer credit from its headquarters in Chicago, Illinois. Plaintiff's loans originated in Chicago, Illinois. All the Class Members' loans, including those involving Tennessee CNU, LLC, similarly originated in Chicago, Illinois. Tennessee CNU, LLC is subject to general jurisdiction and profited handsomely from its business headquartered in Illinois.

33. Venue is proper in this district pursuant to 10 U.S.C.A. § 987(f)(5)(E) and 28 U.S. § 1391, because Defendants extended credit to Plaintiff from this district

and a substantial part of the events and omissions giving rise to the MLA claims at issue occurred in this district.

34. Plaintiff has Article III standing because she suffered a concrete injury in that: (1) she was required to pay and paid interest at a rate that exceeds the 36% MAPR cap in violation of § 987(b); (2) she is required to pay and paid interest on loans that contain terms prohibited by the MLA in violation of § 987(a); (3) she is required to pay and paid money under Defendants' loans that were void from inception because they contain terms prohibited by § 987(e); (4) she is required to pay and paid money under Defendants' loans that were void from inception because Defendants failed to provide written and oral disclosures in violation of 10 U.S.C. § 987(c)(1); and (5) Defendants required Plaintiff to provide her bank account as security for the obligation, to consent to arbitration, to waive their right to a jury trial and to participate in a class action, and required unreasonable notice to file a lawsuit in violation of 10 U.S.C. § 987(e).

35. Josue Galvan currently and all times relevant hereto was an active-duty servicemember of the United States Military holding the rank of Staff Sergeant in the Army. Plaintiff Tamara Galvan is the spouse of Josue Galvan and was at all times relevant hereto.

36. From February 2018 to September 2025, the Galvan Family resided in Montgomery County and were residents of Tennessee. In September 2025, the Galvan Family's military service took them to North Carolina, where they currently live in Cumberland County.

37. At all times material hereto, Staff Sergeant Josue Galvan has been a "covered member" as defined by the MLA, 10 U.S.C. § 987(i)(1)(A), because he was on active duty in the United States Armed Forces. And, at all times material hereto, Tamara Galvan has been a "dependent" of a "covered member" as defined by the MLA, 10 U.S.C. § 987(i)(2) as the spouse of Josue Galvan.

38. Defendants are "creditors" that extended "consumer credit" to Plaintiff and the Class as those terms are defined in 10 U.S.C. § 987(i)(6) and 32 C.F.R. § 232.3(h) & (i).

39. During the Class Period, through Defendants' digital-technology platform, including its website and mobile app, it has: (a) offered and provided Loans; and (b) serviced and collected on Loans, including by notifying and contacting consumers by telephone and electronic means and liquidating and offsetting their accounts.

**THE MILITARY LENDING ACT, 10 U.S.C. § 987, *et seq.***

40. The United States Congress passed the MLA in 2006. It was enacted to protect covered borrowers from unfair or abusive loans to covered members and their dependents, who in the years prior had been disproportionate victims of predatory lending.

41. The MLA directs the Department of Defense ("DoD") to prescribe regulations to carry out the statute.

42. 32 C.F.R. Part 232 implements the MLA and contains limitations on and requirements for certain types of consumer credit extended to covered borrowers.

43. Under MLA regulations passed by the DoD, "consumer credit" is defined as: "Credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) Subject to a finance charge; or (ii) Payable by a written agreement in more than four installments." 32 CFR § 232.3(f)(1).

44. Defendants' Loans constitute extensions of "consumer credit," as defined under the MLA and 32 CFR § 232.3, because: (1) Plaintiff and the other Class members were "covered members" and/or "dependents"; (2) Plaintiff's loans were primarily for personal, family, or household purposes; and (3) Plaintiff's Loans were subject to either a finance charge and/or were payable in more than four installments.

45. The MLA places a duty on "creditors" to determine whether a potential borrower is a "covered borrower."

46. Creditors can use the free MLA Database maintained by the DoD to make this determination.

47. There is nothing in the MLA requiring Plaintiff to identify themselves as "covered borrowers."

## FACTUAL ALLEGATIONS

## I. DEFENDANTS' LOANS

### A. Defendants advertise their Loans as a means of financial empowerment.

48. CashNetUSA advertises all of its Loans as "providing hardworking people with the funds they need fast" and a way "to help you save the day when surprise expenses arise."




49. For example, the flex loan product operates like a line of credit, allowing consumers to draw money when needed up to a limit of $3,000 and then requires monthly installment payments.

50. Defendants' Flex Loans work as follows:



1. **Apply online** in less than 5 minutes.
2. **Receive an instant lending decision.*** Possible decisions include Approved, Need More Information and Declined. If more information is needed, you may need to send in additional documentation like proof of income.
3. **If approved, receive a credit limit** and draw money from your Flex Loan Plan — you can draw as many times as you want, whenever you want, up to your available credit limit (minimum $50 draw).
4. **Request a draw** before 1:30 p.m. CT Monday – Friday, and you will generally receive funds that same business day.
5. **Repay gradually over time or in full**. Every billing cycle, you will have a minimum payment. You can pay more with no penalty in order to repay more quickly.
6. **Increase your available credit** as you repay, freeing up funds to draw, up to your credit limit.
7. **Draw from your available credit** whenever you need funds.

51. Upon information and belief, after a consumer applies for a loan, it is CashNet USA Holdings that performs loan underwriting and approves the loans for all CashNetUSA entities nation-wide.

**B. Defendants fail to give required oral and written MLA disclosures.**

52. The MLA requires certain disclosures both in writing and orally when a lender like CashNetUSA extends "consumer credit" to "covered borrowers" like Plaintiff and the Class:

- A statement of the MAPR applicable to the extension of credit;
- Any disclosure Regulation Z requires to be made in accordance with the applicable Regulation Z provisions; and
- A clear description of the payment obligation, which can be either a payment schedule for closed-end credit, or account opening disclosures consistent with Regulation Z for open-end credit, as applicable.

53. Specifically, the statement of the MAPR need not contain the MAPR for the transaction expressed as a numerical value or dollar amount of charges. Instead, it must describe the charges that may be included in the calculation of the MAPR, including the costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee; and any participation fee. The MLA provides a model statement, and lenders may use the model statement or a substantially similar statement.

54. However, no such disclosures were made to Plaintiff and the Class by CashNetUSA in any written form or orally. Upon information and belief, it is CashNetUSA's routine and systematic practice to not provide any form of these

required MLA disclosures to covered borrowers. On information and belief, the disclosures that were provided by CashNetUSA did not include in the MAPR calculation or disclosures the taxes and fees as ancillary to the Loans.

55. The MLA requires that the disclosures be written and provided in a form that covered borrowers can keep. *In addition to the written disclosures,* lenders must orally provide the information in the statement of MAPR and in the description of the payment obligation. These oral disclosures may be communicated in person or via a toll-free telephone number provided to the borrower. No such required oral disclosures were ever made to Plaintiff and the Class.

### C. Defendants charge expensive fees for Loans in violation of the MLA's usury cap.

56. According to CashNetUSA's website, it applies interest and transaction fees to each consumer's Loan account at the following rates for each state:

| State | Daily Interest Rate | Fees | APR |
|---|---|---|---|
| Alabama | .6274% - .8192% | 15% transaction fee | 229% - 299% |
| Delaware | .6274% - .8192% | 15% transaction fee | 229% - 299% |
| Idaho | .6274% - .8192% | 15% transaction fee | 229% - 299% |
| Kansas | 0.5452% - 0.8192% | 15% transaction fee | 199% - 299% |
| Louisiana | `0.6274% - 0.8192% | 15% transaction fee | 229% - 299% |
| Mississippi | .6822% - .8192% | N/A | 249% - 299% |
| Missouri | .6274% - .8904% | N/A | 229% - 325% |
| South Carolina | .6274% - .8904% | | 229% - 325% |
| Tennessee | .06575% | .56%-.69% | 229% - 275.85% |
| Texas | .6082% - 1.586% | 14% - 18% on amount borrowed | 222% - 579% |

| | | | |
|---|---|---|---|
| Utah | .6274% - .8192% | 15% transaction fee | 229% - 299% |
| Wisconsin (line of credit) | 0.8192% | 15% transaction fee | 299% |
| Wisconsin (installment loan) | Not provided | Not listed | 241% - 449% |

57. When CashNetUSA adds to consumers' balances a "customary fee" in the form of up-front payments or additional interest, its interest rate exceeds the 36% allowable under the MLA by magnitudes of order. Defendants claim they charge these fees "to cover the costs of opening, administering and terminating" Loans.

58. Added together, the total of the interest charge and the customary fee is approximately 222%–579% APR.

59. The MLA prohibits lenders from imposing an MAPR of "interest" above 36%. 10 U.S.C. § 987(b).

60. "Interest" includes "all cost elements associated with the extension of credit, including fees, service charges, . . . and any other charge or premium with respect to the extension of consumer credit." 10 U.S.C. § 987(i)(3).

61. The MAPR is an annual percentage rate based on the definition in TILA, and the statute explicitly includes "all fees and charges, including charges and fees for single premium credit insurance and other ancillary products sold in connection with the credit transaction . . ." 10 U.S.C. § 987(i)(4).

62. Because the customary fee increases the cost charged to borrowers' accounts for the Loans, the fee is "interest" under the MLA. And the customary fees

and transaction fees also qualify as "interest" under the MLA. Thus, both the customary fees and transaction fees should be included in the MAPR calculation.

63. Defendants' MAPR exceeds the rate allowed by the MLA.

64. Neither the interest nor the customary fee is optional. Defendants require every borrower to consent to the interest rate and the customary fee before opening a Loan.

### D. Defendants require that each Loan borrower provide their bank account as security for the loan, in violation of the MLA.

65. Like every lender, Defendants expect to obtain repayment of its loans and the fees it charges.

66. To ensure consumers repay, Defendants require Plaintiff and the Class to provide their bank accounts as security. This means that borrowers must link their bank accounts and payment cards to Defendants' app and authorize Defendants to automatically debit the linked accounts and cards on the borrowers' next scheduled payday in an amount that generally equals all interest and customary fees accrued during the payment cycle plus a percentage of the outstanding principal balance. (Exhibit A, pp. 1, 3, 9.)

67. The MLA prohibits requiring borrowers to provide their bank account as security for the obligation. 10 U.S.C. § 987(e)(5); 32 C.F.R. § 232.8(e).

68. Defendants enforce these automatic debit rights on every loan it issues and continue to debit consumers linked accounts or cards until it obtains repayment of the loan and all fees charged.

69. Repayment can take a long time. For example, if a consumer on a bi-weekly billing cycle has an outstanding balance of $800 at the beginning of the billing period and does not take any additional draws or make any early payments, Defendants will automatically debit the linked bank accounts and payment cards in the amount of $124.64 on the next scheduled payment date. This payment of $124.64 includes $84.64 in interest and customary fees. Only $40 of the payment goes toward the principal of the loan.

70. To ensure that linked bank accounts and payment cards will have sufficient money to satisfy their automatic debits, Defendants require that loan applicants have a verifiable, steady source of income and an active checking account.

71. After determining that it will be able to obtain repayment of the Loan and related charges, Defendants time their account debits to occur immediately after a borrower's paycheck is deposited into their bank account on payday.

72. In other words, Defendants are first in line to receive payment from the borrower's paycheck. In practical terms, this means that Defendants get paid before Plaintiff ever pay their mortgage, groceries, and utilities.

**E. Defendants require Loan borrowers to consent to arbitration, in violation of the MLA.**

73. The MLA prohibits requiring borrowers to consent to arbitration. 10 U.S.C. § 987(e)(3).

74. But Defendants' standard form agreements for Loans require the borrower to consent to arbitration. The agreement states "you or we may elect to arbitrate individually or require individual arbitration of any 'dispute' . . ." (Exhibit

A, p. 6.) In other words, Defendants can unilaterally choose to arbitrate a dispute, and borrowers will be bound by Defendants' choice. This is not elective arbitration; this is mandatory arbitration.

75. Although the agreements allow borrowers to opt out by sending Defendants a signed notice within 60 days, courts have found that arbitration was "mandatory" under the MLA even when a creditor offered a time limited mail-in opt-out provision. *Deven Burkhardt, et al. v. MoneyLion Technologies, Inc. d/b/a MoneyLion et al.*, Case No. 25 Civ. 6761 (DEH) (S.D. NY Apr. 15, 2026) ("nothing in the language of Section 987(e)(3) exempts arbitration with op-out clauses").

### F. Defendants require Loan borrowers to waive their rights to a jury trial and to participate in a class action, in violation of the MLA.

76. The MLA prohibits creditors from requiring that covered members or their dependents waive their "right to legal recourse under any otherwise applicable provision of State or Federal law . . ." 10 U.S.C. § 987(e)(2). The "right to legal recourse" mentioned here has been interpreted to include the right to a jury trial and the right to bring a class action. *Huskey v. Wyndham Vacation Resorts*, 2026 WL 604875, at *18–19 (M.D. Fla. Feb. 19, 2026).

77. Defendants' standard form agreements for Loans require the borrower to waive their rights to a jury trial. (Exhibit A, p. 5.) The agreement also states, "If we elect to arbitrate a Dispute, you waive your rights to be in a class action in court or in arbitration, as a representative and a member." (Exhibit A, p. 7.)

### G. CashNetUSA's Loans require unreasonable notice before initiating a lawsuit.

78. The MLA, 10 U.S.C. § 987(e)(4), declares that requiring covered borrowers to submit unreasonable notice as a condition for legal action is unlawful:

> (4) the creditor demands unreasonable notice from the borrower as a condition for legal action;

79. In order to bring a lawsuit against CashNetUSA, covered borrowers are required to engage in the following pre-suit process:

| | | Process, |
|---|---|---|
| **What must a party do before starting a lawsuit or arbitration?** | **Send a written Dispute notice and work to resolve the Dispute** | We can try to resolve Disputes if you call us at 888-801-9075. If this doesn't resolve the Dispute, before starting a lawsuit or arbitration, the complaining party must give the other party written notice of the Dispute. The notice must explain in reasonable detail the nature of the Dispute and any supporting facts. If you are the complaining party, you must send the notice in writing (and not electronically) to CashNetUSA, Attn: General Counsel, 175 W. Jackson Blvd., Suite 1000, Chicago, IL 60604. You or an attorney you have personally hired must sign the notice and must provide the account number and a phone number where you (or your attorney) can be reached. A letter from us to you will serve as our written notice of a Dispute. Once a Dispute notice is sent, the complaining party must give the other party a reasonable opportunity over the next 30 days to resolve the Dispute on an individual basis. |

80. The Agreement violates 10 U.S.C. § 987(e)(4) because it requires Plaintiff to submit written notice and to engage in pre-suit negotiations before filing suit. In addition, the unreasonable notice explicitly precludes Plaintiff and the Class from initiating a class action case and seeking relief on behalf of others.

### H. CashNetUSA's Loans harm covered borrowers and trap them in a debt cycle.

81. Payday lending refers to a short-term, high-cost form of lending.

82. For example, CashNetUSA extended Loans to Plaintiff on November 14, 2023. Tamara immediately borrowed $2,000, the maximum credit on her account. From that date to May 2025, CashNetUSA allowed Tamara to borrow additional money **seven times**. In total, she borrowed $4,810 from CashNetUSA. During that

same time period, CashNetUSA deducted its payment from her bank account once a month.

83. Short-term, small-dollar lending like CashNetUSA's Loans often traps consumers in reborrowing cycles because the high fees eat into paychecks, which reduce the amount borrowers receive on payday. This shortfall leads borrowers to take out new loans to fill the gap created by paying the old loans.

84. Trapping consumers in reborrowing cycles is highly profitable for lenders (because it enables them to continually harvest payments for expensive charges from a borrower's paycheck), but it does not help improve a person's financial health (because their paycheck is repeatedly diminished by expensive charges, which makes it difficult for them to save money or pay for necessities).

85. This difficult situation for borrowers is exacerbated when, as here, the lender has a security interest in the borrower's bank account. Defendants' control over Plaintiff's bank accounts, coupled with the Defendants' usurious interest rates, has resulted in Plaintiff being trapped in a reborrowing cycle, where they must take out new loans to fill the gaps that have been created by prior loans.

86. Recognizing that high-cost loan products create reborrowing cycles that are detrimental to a person's financial health, Congress enacted the MLA to protect servicemembers and ensure that they would not fall victim to payday lending schemes.

## The Galvan Family Facts

87. Josue Galvan currently and all times relevant hereto was an active-duty servicemember of the United States Military holding the rank of Staff Sergeant in the Army. Plaintiff Tamara Galvan is the spouse of Josue Galvan and was at all times relevant hereto.

88. On or about November 14, 2023, Plaintiff opened an account on cashnetusa.com and filled out a loan application that included her name, date of birth, and social security number.

89. Upon information and belief, CashNet USA has no company policy of complying with the MLA and it extends loans to covered borrowers that violate the MLA as a matter of course. Upon information and belief, CashNet USA transmitted Plaintiff's application information to CashNet USA Holdings, which performed a basic credit check. Upon information and belief CashNet USA Holdings obtained a credit report for Plaintiff that revealed her sole income sources were (a) disabled veteran payments and (b) her husband's military salary, both of which indicated that Plaintiff and her husband were covered borrowers. In addition, when securing the loan with Plaintiff's bank account the Defendants utilized her Navy Federal account, further placing Defendants on notice of her covered borrower status. Further, on information and belief, the credit report relied on covered borrowers like Plaintiff to self-report their covered borrower status and was not sufficiently performed; thus, the credit report does not comply with the safe-harbor provision. 32 CFR § 232.5.

90. CashNet approved Plaintiff for a $2,000 credit limit at an APR of 229%.

91. Plaintiff immediately withdrew the maximum allowable amount, $2000.

92. On or about February 18, 2024, CashNetUSA emailed Plaintiff and informed her that her credit limit had been increased to $2,250 because she was a "valued customer."

93. By June 2025, Plaintiff had taken at least seven loans from CashNetUSA and her outstanding owed balance was $703.79, despite making thousands in monthly payments, including mostly interest.

94. Plaintiff was damaged by Defendants' MLA violations in the following manners: (1) she was required to pay and paid interest at a rate that exceeds the 36% MAPR cap in violation of § 987(b); (2) she was required to pay and paid interest on loans that contain terms prohibited by the MLA in violation of § 987(a); (3) she was required to pay and paid money under Defendants' loans that were void from inception because they contain terms prohibited by § 987(e); (4) she was required to pay and paid money under Defendants' loans that were void from inception because Defendants failed to provide written and oral disclosures in violation of 10 U.S.C. § 987(c)(1); and (5) Defendants required Plaintiff to provide her bank account as security for the obligation, to consent to arbitration, to waive her right to a jury trial and to participate in a class action, and required unreasonable notice to file a lawsuit in violation of 10 U.S.C. § 987(e).

95. Plaintiff is entitled to $500 for each MLA violation, actual damages or restitution, punitive damages, equitable and declaratory relief and costs of action, together with reasonable attorneys' fees, pursuant to 10 U.S.C. § 987(f)(5).

## CLASS ALLEGATIONS

96. Plaintiff brings this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

97. The proposed "MLA Class" is a nationwide class to be represented by the Plaintiff and is defined as:

> All active-duty service members and/or dependents of active-duty service members who entered into a Loan with Defendants in the form of Exhibit A within the five (5) years prior to filing the initial Complaint in this action and made at least one payment.

98. The Class Period ("Class Period") is five (5) years prior to the filing of the initial Complaint. However, credit that was extended greater than 5 years ago may still meet the class definition if the Class Member has the benefit of tolling under the Servicemembers Civil Relief Act ("SCRA"). The SCRA has tolled and continues to toll the statute of limitation for Plaintiff and the other Class members' claims while they remain on active duty and during the terms of their military service. It provides:

> The period of a servicemember's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court . . . by or against the servicemember[.]).

50 U.S.C. § 3936.

99. The SCRA tolls all claims held by the servicemember, even if the servicemember has actual notice of the claim during their military service. *See Warta v. Porta, McGuire, & Kiakona, LLP*, 622 F. Supp. 3d 971, 983 (D. Hawai'i 2022) (applying SCRA tolling to FDCPA claim).

100. The limitations period for the claims of Plaintiff and the Class is also extended by the continuing violation doctrine. Defendants required payment of interest every month. Under the continuing violation doctrine, each month they required Plaintiff to pay interest, Defendants violated 10 U.S.C. § 987(a).

101. Expressly excluded from the Class are: (a) any Judge presiding over this action and members of their immediate families; (b) Defendants and any entity in which Defendants have a controlling interest, or which has a controlling interest in Defendants, and their legal representatives, assigns and successors; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

102. Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.

**Rule 23 Criteria**

103. Numerosity. Because Defendants extend their Loans to military consumers as set forth above in 10 states, Plaintiff believes that there are at least 100 Class members. Joinder of this many Class members would be impracticable. The exact number of Class members is unknown, as such information is in Defendants' exclusive control. However, the number of Class members can be easily determined through Defendants' business records. Specifically, this can be determined by obtaining a list of persons who paid interest on a Loan extended by Defendants during the Class Period and running those names through the DoD's MLA database to verify covered members and their dependents. Upon information and belief, Defendants

maintain the information electronically that is required to identify the members of the Class.

104. Commonality. Common questions of law and fact affecting the rights of each Class member and common relief by way of damages is sought for Plaintiff and the Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

a. Whether Defendants entered into standard form agreements for Loans with servicemembers and their dependents;

b. Whether Defendants' Loans are an extension of consumer credit under the MLA;

c. Whether Defendants violated 10 U.S.C. § 987(a) of the MLA by requiring covered members and their dependents, like Plaintiff, to pay interest that exceeded the statutory rate cap of 36% MAPR;

d. Whether Defendants violated 10 U.S.C. § 987(e) of the MLA by requiring that Plaintiff and the Class provide their bank accounts as security for the obligation;

e. Whether Defendants violated 10 U.S.C. §§ 987(e)(2), (e)(3), (e)(6) and (f)(4) by requiring that Plaintiff and the Class consent to arbitration and waive their rights to a jury trial and to pursue a class action, and by requiring unreasonable notice;

f. Whether Defendants violated 10 U.S.C. § 987(a) of the MLA by charging interest on Loans despite the violations identified in (c), (d), and (e) above;

g. Whether Defendants' standard form agreements extended to Plaintiff and the Class are void from inception as a result of the MLA violations; and

h. The remedies and damages to which Plaintiff and the Class are entitled under 10 U.S.C. § 987(f)(5).

105. Typicality. The claims and defenses of the representative Plaintiff are typical of the claims and defenses of the Class because she is the dependent of a covered members under the MLA like the rest of the Class and their claims arise under the same legal theories and out of a common course of conduct. Plaintiff obtained the similar Loan product as the Class members. These loan products uniformly require the payment of interest that exceeds 36% MAPR and require Plaintiff and the Class to provide their bank accounts as security for the obligation of the loans, to consent to arbitration, and to waive their right to a jury trial and a class action, all of which are prohibited by the MLA. Defendants also extended rollover credit in violation of the MLA. As a result of these violations, these loans are void from inception, and Plaintiff suffered statutory and actual damages of the same type and in the same manner as the Class she seeks to represent. There is nothing peculiar about Plaintiff's claims when compared to those of the other members of the Class.

106. Adequacy. Plaintiff will fairly and adequately assert and protect the interests of the Class. As active-duty military servicemembers and their dependents, Plaintiff is a "covered member" or "dependent" as defined under section 987(i)(1)(2) of the MLA. Plaintiff has no conflict of interest with the Class members she seeks to represent. She has hired attorneys who likewise have no conflicts of interest with the Class and who are experienced in prosecuting class actions, consumer-protection claims, and MLA claims in particular, and will adequately represent the interests of the Class.

107. Predominance and Superiority. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons:

a. The common questions of law and fact set forth herein predominate over any questions affecting only individual Class members. The MLA violations at issue turn on standard contract language set forth in form agreements, thereby making MLA liability capable of being determined on common evidence. MLA covered member status can be accomplished by using the MLA database maintained by the DoD;

b. Prosecution of separate actions by each individual member of the Class would create a risk of inconsistent and varying adjudications against Defendants;

c. Most covered members and/or dependents are unaware that their loans are void under the MLA;

d. Adjudication with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudication, or substantially impair their ability to protect their interests;

e. As an Illinois-based company, Defendants likely extended hundreds of loans from its offices in this District,[2] thereby violating the MLA hundreds of times within this District, making this Court appropriate for the litigation of the claims of the entire Class;

f. There are very few attorneys in the United States with any expertise or experience in this nascent area of law making it nearly impossible for Class members to find adequate representation; and

g. The novelty of these claims and the fact that individual damages may be modest in comparison to the time required to litigate the case makes a class action the only viable procedural method of redress in which Class members can, as a practical matter, recover for the conduct at issue. In fact, the vast majority of Class members are probably not even aware that they have a claim.

108. Defendants acted and refused to act on grounds generally applicable to the Class, thereby making declaratory relief and corresponding final injunctive relief under Rule 23(b)(2) appropriate with respect to the Class as a whole.

---

[2] For example, David Fisher, CEO of Enova, executed the Plaintiffs' contract as "Authorized Representative, Tennessee CNU, LLC" and Fisher is, on information and belief, based out of the Chicago office.

109. Defendants' loan terms are standardized for the Class, meaning that all Class members were subjected to the same unlawful terms and suffered the same types of harm arising from materially identical agreements. The MLA's protections are not contingent on individual reliance but on whether the creditor imposed prohibited terms. Because Defendants' MLA violations are uniform, the Class mechanism is the only practical way to vindicate servicemembers' rights.

110. Plaintiff and the Class are entitled to a declaration that their contracts are void, and Defendants should be enjoined from attempting to collect any monies pursuant to these contracts or enforcing them in any way.

**COUNT I**
**Violations of the Military Lending Act 10 U.S.C. § 987, *et seq*.**
**On Behalf of the Class**

111. Plaintiff and the Class repeat and re-allege the allegations contained in paragraphs 1 through 110 as if set forth herein in full.

112. Staff Sergeant Josue Galvan was serving as an active-duty member of the United States Army and was married to Tamara Galvan on the date that the loan was first extended by Defendants. Josue Galvan and Tamara Galvan were and are "covered borrowers," "covered members" and "dependents" as those terms are defined by 32 C.F.R. § 232.3(g). Plaintiff was a covered borrower for each and every loan extended and monthly payment made.

113. Members of the putative Class are also those individuals who were active-duty servicemembers or their spouses on the date they received their Loans extended by Defendants.

114. Each Loan extended by Defendants to Plaintiff and the Class was for personal, family, or household purposes and contains a "finance charge." Each Loan was also payable by written agreement in more than four installments.

115. Defendants are a "creditor" that provided "consumer credit" to Plaintiff and the Class as those terms are defined in 32 C.F.R. §§ 232.3(f), (h) & (i).

**MAPR VIOLATION**

116. The MLA prohibits charging "interest" to covered borrowers above a 36% MAPR. 10 U.S.C. § 987(b).

117. As explained above, both the customary fees and the fees Defendants designated as "interest" constitute "interest" under the MLA. And both charges should be used to calculate the MAPR, which significantly exceeds the cap of 36%.

118. Plaintiff and all Class members who were required to and did pay interest on their Loans with Defendants were damaged as a result of the unlawful extension of consumer credit in violation of 10 U.S.C. § 987(a).

119. As a result of unlawfully requiring covered borrowers like Plaintiff and the Class to enter into loans which require them to pay interest that exceeds 36% MAPR in violation of 10 U.S.C. § 987(a) and (b), the Loans that Defendants extended to the Plaintiff and the Class are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 CFR § 232.9(c).

**SECURITY INTEREST VIOLATION**

120. The MLA prohibits creditors from requiring that covered members and their dependents provide their bank accounts as security for the obligation when a

loan exceeds the statutory rate cap of 36% MAPR. 10 U.S.C. § 987(e)(5) and 32 C.F.R. 232.8.

121. Defendants' standard form agreements for the Loans include security provisions with no exception for covered borrowers under the MLA, including the agreement Defendants entered into with Plaintiff that exceeded 36% MAPR.

122. As a result of unlawfully requiring covered borrowers like Plaintiff and the Class to enter into loans which require them to provide their bank account as security for a loan obligation that exceeds 36% MAPR in violation of 10 U.S.C. § 987(e)(5) of the MLA, the Loans that Defendants extended to the Plaintiff and the Class are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 CFR § 232.9(c).

**ARBITRATION VIOLATION**

123. The MLA prohibits creditors from requiring that covered members or their dependents submit to arbitration. 10 U.S.C. § 987(e)(3).

124. But Defendants' standard form agreements for Loans require the borrower to consent to arbitration if Defendants invoke it.

125. As a result of unlawfully requiring covered borrowers like Plaintiff and the Class to enter into loans which require them to consent to arbitration in violation of 10 U.S.C. § 987(e)(3) of the MLA, the Loans that Defendants extended to the Plaintiff and the Class are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 CFR § 232.9(c).

## JURY-TRIAL-WAIVER AND CLASS-ACTION-WAIVER VIOLATION

126. The MLA prohibits creditors from requiring that covered members or their dependents waive their right to a jury trial or their right to participate in a class action. 10 U.S.C. § 987(e)(2).

127. Defendants' standard form agreements for Loans require the borrower to waive their rights to a jury trial (Exhibit A, p. 5) and their right to participate in a class action (Exhibit A, p. 7).

128. As a result of requiring Plaintiff and Class members to waive their rights to a jury trial and to participate in a class action in violation of 10 U.S.C. § 987(e)(2) of the MLA, the Loans that Defendants extended to the Plaintiff and the Class are "void from inception" pursuant to 10 U.S.C. § 987(f)(3) and 32 CFR § 232.9(c).

## UNLAWFUL INTEREST

129. The MLA prohibits creditors from charging interest on a loan that violates any provision of the MLA. 10 U.S.C. § 987(a)(3).

130. Each violation listed above independently invokes this prohibition. And, upon information and belief, Defendants included these violative terms in each Loan it extended to covered borrowers. Thus, every time Defendants charged interest on one of these loans, Defendants violated 10 U.S.C. § 987(a).

## UNREASONABLE NOTICE

131. The Loans violate 10 U.S.C. § 987(e)(4) because it requires Plaintiff and the Class to participate in a lengthy pre-suit notice process that only allows them to resolve their case on an individual basis.

## MLA REMEDIES

132. Defendants' MLA violations occurred when they charged interest on loans with MLA-violative interest rates and for Loans that required Plaintiff and the Class to provide their bank accounts as security for the obligation in a loan that exceeds 36% MAPR. As a result, the loans that Defendants extended to Plaintiff and the Class are void as a matter of law.

133. Defendants required Plaintiff to pay interest on Defendants' void loan agreements.

134. Plaintiff paid interest on Defendants' void loan agreements.

135. Each of Defendants' MLA violations are separate and independent under the MLA.

136. Each time that Plaintiff paid money on Defendants' void loans constitutes a separate and independent violation under the MLA and damages caused by Defendants' unlawful MLA conduct.

137. Each time that Defendants assessed interest on its void loans to Plaintiff and the Class restarts the statute of limitations under the MLA.

138. The remedy to cure Defendants' violations of the MLA is voiding the loans of Plaintiff and the Class "from inception," pursuant to 10 U.S.C. § 987(f)(3) and 32 CFR § 232.9(c).

139. 10 U.S.C. § 987(f)(5) and 32 CFR § 232.9(e)(1) further provide that Plaintiff and each member of the Class are entitled to actual damages sustained but not less than $500.00 for each separate violation of the MLA, plus appropriate punitive damages, injunctive or declaratory relief, and any other available relief.

140. Defendants are also liable for Plaintiff's attorneys' fees and costs pursuant to 32 CFR § 232.9(e)(2) and 10 U.S.C. § 987(f)(5)(B).

## COUNT II
## Declaratory Judgment Act, 28 U.S.C. § 2201
## On Behalf of the Plaintiff

141. Plaintiff repeats and re-allege the allegations contained in paragraphs 1 through 110 as if set forth herein in full.

142. This is a claim for a declaratory judgment against Defendants under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

143. This claim is also authorized under the MLA. 10 U.S.C. § 987(f)(5).

144. Plaintiff alleges that Defendants' Loans violate the MLA.

145. There exists an immediate, substantial, real, and justiciable controversy between Plaintiff on one hand and Defendants on the other with respect to whether the MLA applies to Plaintiff's loans and whether their loans are void.

146. Plaintiff is entitled to a declaration declaring that: (1) the MLA applies to their loans; and (2) their loans are void and unenforceable.

## REQUESTED RELIEF

Plaintiff respectfully request that this Court enter order and judgment as follows:

A. An order certifying this action to proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class Representative, and appointing the undersigned as Class Counsel;

B. A judgment declaring Plaintiff's and the Class members' loans void from inception because they violate the MLA and awarding Plaintiff and the Class the equitable, declaratory and injunctive relief set forth in 10 U.S.C. § 987;

C. A judgment awarding Plaintiff and Class members actual damages paid in connection with or pursuant to the illegal and void loans not less than $500.00 per MLA violation, together with appropriate punitive damages pursuant to 10 U.S.C. § 987(f)(5)(A);

D. A judgement awarding Plaintiff and Class members all of the damages allowed by 15 U.S.C. § 1640.

E. A judgment awarding Plaintiff and the Class reasonable attorneys' fees and costs incurred in this action pursuant to 10 U.S.C. § 987(f)(5)(B) and 15 U.S.C. § 1640;

F. A judgment awarding Plaintiff and the Class all pre-judgment and post-judgment interest recoverable at law or in equity;

G. A declaration that Plaintiff's loans are void; and

H. A judgment awarding Plaintiff and the Class such other and further relief to which they are justly entitled.

**JURY TRIAL DEMAND**

Plaintiff and the Class demand a jury trial on all issues so triable.

Dated: August 13, 2026

**Respectfully Submitted,**

**VARNELL & WARWICK, P.A.**

/s/ Jeffrey L. Newsome, II
Jeffrey L. Newsome, II: FBN: 1018667*
Janet R. Varnell; FBN: 0071072*
Brian W. Warwick; FBN: 0605573*
400 N Ashley Drive, Suite 1900
Tampa, FL 33602
Telephone: 352-753-8600
jnewsome@vandwlaw.com
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
service@vandwlaw.com

*admitted Pro Hac Vice

/s/ Stacy M. Bardo
Stacy M. Bardo
Bardo Law, P.C.
203 North LaSalle Street, Suite 2100
Chicago, Illinois 60601
Telephone: 312-219-6980
stacy@bardolawpc.com

***Attorneys for Plaintiff and Proposed Class***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 13, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Jeffrey L. Newsome, II
Jeffrey L. Newsome, II